

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

Sean R. Delaney
Assistant United States Attorney
Sean.Delaney@usdoj.gov

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4913
MAIN: 410-209-4800
FAX: 410-962-3091

December 15, 2015

FILED ___ ENTERED
___ LODGED ___ RECEIVED

JAN 0 5 2016

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ DEPUTY

Charles N. Curlett, Esq.
Levin & Curlett LLC
201 N. Charles St., Suite 2000
Baltimore, MD 21201
(410) 685-0008

Re: Alan Landsman

Dear Mr. Curlett:

This letter, together with the Sealed Supplement, confirms the plea agreement that has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by **January 5, 2016**, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1. The Defendant agrees to plead guilty to Count One of an Information charging him with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349. The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

### Elements of the Offense

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which the Government would have proven if the case had gone to trial, are as follows:

   a. The Defendant and at least one other person entered into an unlawful agreement;

   b. The purpose of the agreement was to knowingly execute or attempt to execute a scheme and artifice to defraud or to obtain money by means of materially false and fraudulent pretenses, representations and promises, as charged in the Information;

   c. The Defendant knowingly and willfully became a member of the conspiracy.

Penalties

3.  The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is twenty (20) years of imprisonment, a fine of not more than $250,000, or twice the gross gain or loss derived or resulting from the offense, whichever is greater, and a term of supervised release of up to three (3) years. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

Waiver of Rights

4.  The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

    a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

2

Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h. By pleading guilty, the Defendant may also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant understand, agree, and stipulate to the Statement of Facts set forth in Attachment A hereto, which this Office would prove beyond a reasonable doubt, and to the following applicable sentence guidelines factors:

   a. Pursuant to U.S.S.G. § 2B1.1(a)(1), the Base Offense Level for this offense is 7.

   b. Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), the Base Offense Level is increased by 22 levels because the loss was between $25,000,000 and $65,000,000.

   c. Pursuant to U.S.S.G. § 2B1.1(b)(2)(A), the Base Offense Level is increased 2 levels because the offense involved 10 or more victims.

   d. Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), the Base Offense Level is increased 2 levels because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

   e. This Office does not oppose a 2 level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1 level decrease in recognition of the Defendant's timely notification of his intention to plead guilty.

   f. This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

**Accordingly, the resulting adjusted offense level is 30.**

7. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

4

8. This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

### 18 U.S.C. § 3553(a)

9. This Office and the Defendant agree that both parties reserve the right to argue that this Court should sentence the Defendant to a variant sentence outside of the advisory guidelines range determined by the Court. This Office and the Defendant stipulate and agree that if either party intends to argue, pursuant to 18 U.S.C. § 3553(a), that the sentence in this case should fall outside of the advisory guidelines range based on any factor, that party will notify opposing counsel at least 14 days in advance of sentencing of the facts or issues the party intends to raise. If the party seeking the non-guideline sentence fails to provide timely notice of the intent to argue for a sentence outside the advisory guidelines range, that party will withdraw the 3553(a) arguments or consent to a continuance of the sentencing date.

### Obligations of the United States Attorney's Office

10. At the time of sentencing, this Office will recommend a sentence of imprisonment it deems to be sufficient, but not greater than necessary, to accomplish the purposes set forth in 18 U.S.C. § 3553(a), and an order of restitution to the victims of the fraud in the amount of $58,656,369.

11. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including any conduct that is related to the overall scheme that gave rise to the pending charges, but that is not otherwise charged substantively.

### Collection of Financial Obligations

12. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

## Restitution

13.     The Defendant agrees to the entry of a Restitution Order in the amount of $58,656,369, the amount of loss. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Forfeiture

14.     The Defendant understands that the Court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order will include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property subject to forfeiture. Specifically, as a consequence of the Defendant's plea of guilty to Count One of the Information charging a violation of 18 U.S.C. § 1349, the Court will order the forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud.

The property to be forfeited includes but is not limited to, a sum of money equal to the proceeds of the scheme to defraud foreseeable to the Defendant, which amount is at least $58,656,369.

15.     The Defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

## Assisting the Government with Regard to Forfeiture

16.     The Defendant agrees to assist fully in the forfeiture of the foregoing assets. The Defendant agrees to disclose all of his assets and sources of income to the United States, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. The Defendant also agrees to give this Office permission to request and review his federal and state income tax returns, and any credit reports maintained by any consumer credit reporting entity, until such time as the money judgment is satisfied. In this regard, the Defendant agrees to complete and

6

sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) as well as whatever disclosure form may be required by any credit reporting entity.

### Waiver of Further Review of Forfeiture

17. The Defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The Defendant also agrees not to challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this agreement, and will not assist any third party with regard to such challenge or review or with regard to the filing of a petition for remission of forfeiture.

### Waiver of Appeal

18. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291, or otherwise, to appeal the Defendant's conviction;

   b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release);

   c. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error; and

   d. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

19. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who

7

prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

20. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

21. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and addendum and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this letter, please sign and have the Defendant sign the original and return it to me promptly.

Rod J. Rosenstein
United States Attorney

By: *[signature]*
Sean R. Delaney
Assistant United States Attorney

I have read this agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I understand this plea agreement, and I voluntarily agree to it. I am completely satisfied with the representation of my attorney.

12/21/2015
Date

*[signature]*
Alan Landsman

I am Mr. Landsman's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

12/21/15
Date

*[signature]*
Charles N. Curlett, Esq.

9

## ATTACHMENT A

## FACTUAL STIPULATION

It is agreed and stipulated that were the Government to proceed to trial in this case, it would prove, beyond a reasonable doubt, by admissible testimonial and documentary evidence, the guilt of the Defendant on the charge of conspiracy to commit ~~wire~~ mail fraud, in violation of 18 U.S.C. § 1349.

The Defendant agrees to the truth of the summary of evidence set forth below and acknowledges that it does not represent all the evidence the Government would have produced had the case proceeded to trial.

At all relevant times, the defendant **ALAN LANDSMAN ("LANDSMAN")** resided in York, Pennsylvania. He worked at Midway Industries, LLC ("Midway"), a telemarketing company incorporated in the State of Maryland that purported to sell light bulbs and cleaning supplies to companies throughout the United States.

From in or about 2010 through in or about July 2014, in the District of Maryland and elsewhere, **LANDSMAN** did knowingly and willfully conspire, confederate, and agree with others known and unknown ("the Midway co-conspirators") to commit mail fraud, that is to knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property from various businesses, by means of materially false and fraudulent pretenses, representations, and promises regarding light bulb and cleaning supply orders ("the scheme to defraud"), and for the purpose of executing and attempting to execute such scheme to defraud, did knowingly cause to be delivered by mail and by any private and commercial interstate carrier any matter and thing, according to the direction thereon, in violation of 18 U.S.C. § 1341.

It was the object of the conspiracy and scheme to defraud that **LANDSMAN** and the Midway co-conspirators obtained money from thousands of victim businesses by deceiving the businesses' authorized representatives into paying exorbitant prices for light bulbs and cleaning supplies, as well as paying for products that the businesses never ordered.

### Shell Entities

**LANDSMAN** and the Midway co-conspirators created and caused to be created various shell entities with no legitimate purpose, including Commercial Industries, LLC, Environmental Industries, LLC, Essex Industries, LLC, Hansen Supply, LLC, Johnson Distributing, LLC, Mid-Atlantic Industries, LLC, National, LLC, Standard Industries, LLC, State Power and Electric, LLC, State Power and Lighting, LLC (collectively the "Shell Entities"). From in or about April 2010 through in or about July 2014, **LANDSMAN** and the Midway co-conspirators made and caused to be made phone calls to victim businesses purportedly on behalf of various individual Shell Entities. In those phone calls to victim businesses, **LANDSMAN** and the Midway co-conspirators misled victim businesses by concealing that Midway Industries, LLC and the Shell Entities (collectively "Midway") were being jointly operated by the Midway co-conspirators

10

from the same location in Reisterstown, Maryland, as well as locations in Del Ray Beach and West Palm Beach, Florida.

**LANDSMAN** and the Midway co-conspirators used Post Office boxes throughout Maryland for each of the Shell Entities to cause the victim businesses to believe that each Shell Entity was a different company, and to conceal Midway's true location from the victim businesses. They avoided calling businesses located in Maryland and Florida for the purpose of concealing Midway's true location and avoiding in person contact with victim businesses.

<u>False Representations Made to Victim Businesses</u>

**LANDSMAN** and the Midway co-conspirators used commercially available "lead sheets" to make "cold calls" to contact representatives of the victims businesses with authority to place an order ("authorized representative"), who were often maintenance employees. **LANDSMAN** and the Midway co-conspirators made false and fraudulent representations to authorized representatives on cold calls, including:

   a. Misrepresenting that the victim business had an existing business relationship with Midway;
   b. Misrepresenting that the purpose of the phone call was to provide an updated phone number, or to send catalogues to the victim business;
   c. Misrepresenting that Midway would send a "half box" of light bulbs along with the catalogue, when in truth and fact, there was no such thing as a half box.

When making initial calls, **LANDSMAN** and the Midway co-conspirators regularly promised Wal-Mart and Bass Pro Shops gift cards to authorized representatives in order to induce authorized representatives to place initial orders or to provide to Midway additional company information or personal information, like the authorized representatives' home addresses and personal phone numbers. **LANDSMAN** and the Midway co-conspirators avoided divulging the price of any products to victim businesses by engaging in a practice called the "price blow-off," in which they falsely stated that they did not have the price in front of them, but that it would be at the corporate discount. In truth and fact, Midway did not offer a corporate discount.

**LANDSMAN** and the Midway co-conspirators sent invoices for payment to the victim businesses. If the invoices were not paid, the Collections Department at Midway got involved. If a victim company paid a Midway invoice, **LANDSMAN** and the co-conspirators placed subsequent sales calls to the victim businesses. On subsequent calls, **LANDSMAN** and the Midway co-conspirators made additional false representations, including:

   a. Misrepresenting that the "completion" or "balance" of the victim business' order had recently been shipped, despite no order having yet been made by the victim business, and no actual shipment having yet been sent;
   b. Misrepresenting that the victim business' "regular seasonal order" had recently been shipped, despite no order having yet been made by the victim business, and no actual shipment having yet been sent.

11

**LANDSMAN** and the Midway co-conspirators would regularly call authorized representatives repeating the above-referenced false representations so long as the victim business continued paying Midway's invoices. They also called authorized representatives under the guise of different Shell Entities in order to repeat the process using a product other than light bulbs, often cleaning supplies.

Price Markups and Collections

**LANDSMAN** and the Midway co-conspirators placed and caused to be placed orders for light bulbs and cleaning supplies with a company located in New Jersey identified as Company A. At the Midway co-conspirators' instruction, Company A shipped light bulbs and cleaning supplies to the victim businesses without an invoice, and sent its invoices directly to Midway. **LANDSMAN** and the Midway co-conspirators then sent and caused to be sent invoices to the billing departments of the victim businesses, which were often different departments from those of the authorized representatives, for amounts greatly inflated from the amounts charged by Company A. These invoices were regularly 900% above the prices Midway paid Company A for the same light bulbs and cleaning supplies. After victim businesses had paid one invoice, the Midway co-conspirators sent and caused to be sent invoices to the victim businesses that were sometimes greater than 8,000% above the prices Midway paid Company A for the same light bulbs and cleaning supplies. The Midway co-conspirators set the markup to extract as much money as possible without the victim businesses becoming aware of the fraud.

When victim businesses did not remit payment, the Collections Department at Midway repeatedly called and made demands on victim businesses in order to force them to pay the overly-inflated invoices sent to them by Midway. Midway co-conspirators in the Collections Department would insist that the fact the authorized representative had provided his home address for the purposes of receiving a gift card indicated that the authorized representative had actually placed an order with Midway.

In the event that a victim business threatened to contact law enforcement or the Better Business Bureau, the Midway co-conspirators would offer to take back a product at either a discounted rate or for a re-stocking fee that was still substantially greater than the cost of the products purchased from Company A.

Additional Fraudulent Techniques

On multiple occasions, when the authorized representative at a victim company could not be reached by phone, **LANDSMAN** and the Midway co-conspirators would "just ship," or "J/S," a reference to the practice of causing a product and inflated invoice to be sent to a victim business, even though the victim business had placed no order with Midway. This practice was also commonly referred to as "taking a shot." On multiple occasions, when **LANDSMAN** and the Midway co-conspirators learned that the authorized representative at a victim company had quit, been fired, or even passed away, they caused a product and inflated invoice to be sent to the victim company knowing that the company would be unable to dispute the validity of the order. This practice was referred to by the Midway co-conspirators as a "down the road."

Between 2010 and 2014, Midway sent fraudulent invoices to victim companies for more than $100,000,000, and received more than $50,000,000 in payments on those invoices.

In furtherance of the conspiracy and for the purpose of executing the scheme to defraud, **LANDSMAN** and the Midway co-conspirators, in the District of Maryland and elsewhere, did knowingly cause to be delivered by mail and by any private and commercial interstate carrier any matter and thing, according to the direction thereon, including:

| DATE | DESCRIPTION |
| --- | --- |
| 6/28/2013 | Invoice from National, LLC in Maryland mailed to Victim Business #1 in Bronx, New York, for $590.96 for light bulbs ordered from Company A with a cost of $82.30. |
| 9/17/2013 | Invoice from Standard Industries, LLC in Maryland to Victim Business #2 in Savanna, Oklahoma for $999.45 for light bulbs ordered from Company A with a cost of $74.00. |
| 4/15/2014 | Invoice from National, LLC in Maryland mailed to Victim Business #1 in Bronx, New York, for $590.96 in light bulbs ordered from Company A with a cost of $83.01. |
| 8/14/2013 | Invoice from Commercial Industries, LLC in Maryland mailed to Victim #3 in Lewisville, Texas, for $999.97 for light bulbs ordered from Company A with a cost of $67.51 |
| 1/3/2014 | Invoice from Commercial Industries, LLC in Maryland mailed to Victim Business #3 in Lewisville, Texas, for $4,947.35 for light bulbs ordered from Company A with a cost of $70.80. |

*****

I have read this statement of facts, and carefully reviewed it with my attorney. I acknowledge that it is true and correct.

12/21/2015
Date

Alan Landsman

I am Alan Landsman's attorney. I have carefully reviewed this statement of facts with him.

12-21-15
Date

Charles N. Curlett, Esq.

14